# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### COLUMBIA DIVISION

| | | |
|---|---|---|
| **BETTY JEAN MARTIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 1:13-00021** |
| **v.** | ) | **Judge Nixon/Brown** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **ACTING COMMISSIONER** | ) | |
| **OF SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**To: The Honorable John T. Nixon, Senior United States District Judge**

## REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration ("the SSA"), through its Commissioner ("the Commissioner"), denying plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i), 423(d). For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the record (Doc. 12) be **DENIED** and the Commissioner's decision **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on September 1, 2009 (Doc. 10, pp. 137-41) alleging a disability onset date of April 1, 2003 (Doc. 10, p. 89). Plaintiff claimed that she was unable to work because of back and hip pain, a hernia, and high blood pressure. (Doc. 10, pp. 51, 55) Plaintiff's last insured date for DIB was December 31, 2007. (Doc. 10, p. 90)

Plaintiff's claims were denied initially on February 5, 2010, and again upon reconsideration on April 21, 2010. (Doc. 10, pp. 48-50, 53-54) Thereafter, plaintiff filed a request for a hearing before an Administrative Law Judge (ALJ). (Doc. 10, p. 56) A hearing was held on November 3,

2011 before ALJ Brian Dougherty. (Doc. 10, pp. 26-45) Plaintiff elected to proceed at the hearing without representation, and completed a waiver at the hearing to that effect. (Doc. 10, pp. 28, 79) Vocational expert (VE) Kenneth Anchor, Ph.D., testified at the hearing. (Doc. 10, pp. 40-42)

The ALJ entered an unfavorable decision on November 10, 2011. (Doc. 10, pp. 13-25) Thereafter, plaintiff retained the services of attorney David Downard through whom plaintiff filed a request with the Appeals Council on January 13, 2012 to review the ALJ's decision. (Doc. 10, pp. 6-8, 11) The Appeals Council denied plaintiff's request on January 24, 2013, whereupon the ALJ's decision became the final decision of the Commissioner. (Doc. 10, pp. 1-5)

Counsel brought this action on behalf of plaintiff on March 15, 2013 seeking judicial review of the Commissioner's decision. (Doc. 1) Plaintiff filed a motion for judgment on the administrative record on June 21, 2013 (Doc. 12), the Commissioner responded on August 19, 2013 (Doc. 15), and plaintiff replied on September 5, 2013 (Doc. 16). This matter is now properly before the court.

## II. REVIEW OF THE RECORD

### A. Medical Evidence[1]

Medical records from the Maury Regional Hospital (Maury Regional) cover the period May 17, 2002 through April 14, 2008. (Doc. 10, pp. 142-210) Plaintiff presented for treatment during this period for fainting spells, back pain, and high blood pressure. The objective medical evidence in the Maury Regional records is described below.

On June 3, 2002, plaintiff underwent a CT scan of the head following a syncopal[2] episode.

---

[1] Because plaintiff sought DIB only, and because her last insured date was December 31, 2007, the medical records discussed below dated after December 31, 2007 are not germane to plaintiff's DIB claim and are addressed solely for the sake of completeness.

[2] Syncope – "a temporary suspension of consciousness . . . called also [a] faint." *Dorland's Illustrated Medical Dictionary* 1818 (32nd ed. 2012).

The CT scan was normal.  (Doc. 10, p. 145)  Plaintiff underwent an MRI of the brain for syncope and vertigo on June 6, 2002.  Apart from "mild ethmoid[3] and moderate sphenoid[2] sinus disease," the MRI was normal.  (Doc. 10, pp. 142-43)  The results of radiographic examinations of the chest and abdomen conducted on six occasions between December 8, 2005 and January 9, 2007 were characterized as unremarkable, borderline, normal, stable, negative, etc.  (Doc. 10, pp. 157-171)  X-rays of plaintiff's spine on November 20, 2007 were normal apart from the transitional lumbosacral vertebra.[4]  (Doc. 10, p. 182)  Plaintiff underwent an MRI of the lumbar spine on December 3, 2007.  (Doc. 10, pp. 180)  In addition to "[a]pparent transitional lumbosacral vertebra," there were "mild desiccation[5] changes," but no other findings.  (Doc. 10, p. 180)  An abdominal ultrasound on March 27, 2008 was normal.  (Doc. 10, p. 208)  A nuclear medicine study of the upper abdomen and gallbladder on April 14, 2008 was normal.  (Doc. 10, p. 209)

Medical records of Dr. Belinda Bart, M.D., cover the periods June 9, 2006 to October 12, 2009, and August 1, 2011 to August 22, 2011.  (Doc. 10, pp. 211-18, 229-32)  Plaintiff presented for treatment during these periods for a variety of reasons, including: recurrent lumbar pain with radiculopathy;[6] hip pain; neck and foot pain, benign essential hypertension; general pain; nasal congestion and related symptoms; fatigue; headaches; routine examinations; and to obtain prescription medications.  There is no objective medical evidence in any of these records.[7]

---

[3]  Ethmoid and sphenoid – bones in the nasal cavity.  *Dorland's* at 1720-21.

[4]  "A transitional vertebra is one that has indeterminate characteristics and features of vertebrae from adjacent vertebral segments."  http://radiopaedia.org/ articles/transitional-vertebra.

[5]  Desiccation – "the act of drying."  *Dorland's* at 500.

[6]  Radiculopathy – "disease of the nerve roots and nerves."  *Dorland's* at 1571.

[7]  On April 8, 2008, Dr. Bart noted that an "abdominal ultrasound was negative," and on several other dates that plaintiff's labs were "okay."  (Doc. 10, pp. 212, 215-16)  Dr. Bart also noted in her clinical records that plaintiff would be scheduled for a "DISIDA scan" [a nuclear medicine that shows the function of the gallbladder], and that she

Diagnosis/treatment in these records is based solely on plaintiff's subjective complaints.

Dr. John Mather, M.D., completed a physical residual functional capacity assessment of plaintiff on February 4, 2010. (Doc. 10, pp. 219-27) Dr. Mather assessed the following exertional limitations: 1) able to lift and/or carry 50 lbs. occasionally; 2) able to lift and/or carry 25 lbs. frequently; 3) able to stand and/or walk about 6 hours in an 8-hour workday with normal breaks; 4) able to sit with normal breaks for about 6 hours in an 8-hour workday; 5) no push-pull restrictions. (Doc. 10, p. 220) Dr. Mather did not establish any postural, manipulative, visual, communicative, or environmental limitations. (Doc. 10, pp. 221-23) Dr. Mather's overall impressions were as follows:

> CL [claimant] has mild DDD [degenerative disc disease] of the lumbar spine up to DLI [date last insured]. Some pain meds. No attenuation of ADLSs [activities of daily living]. HBP [high blood pressure] under control on meds. CL's statements of pain are for current time and until about two years ago was not severe, except for one acute episode. Benefit from PT [physical therapy] with reduced pain. Obesity may contribute.

(Doc. 10, p. 226)

Dr. John Fields, M.D., affirmed Dr. Mather's physical assessment as written on April 18, 2010. (Doc. 10, p. 228) Dr. Fields reported that plaintiff's ankle, back, hip, hernia, and blood pressure claims submitted on reconsideration all occurred after the date last insured.

Plaintiff provided an unsigned, undated form captioned "CLAIMANT'S RECENT MEDICAL TREATMENT," Form HA-4631, in which she wrote: "Dr. Bart is treating me with Pain Nerve Pills & Muscle Relaxer." (Doc. 10, p. 137) The boxes corresponding to "No" are checked in response to the questions, "[h]ave you been treated or examined by a doctor (other than a doctor

---

would "check MRI of LS spine." (Doc. 10, pp. 212-13) Apart from these tangential references, there is no objective medical evidence in these records. To the extent that these notes in Dr. Bart's clinical records pertain to the March 27 and April 14, 2008 studies conducted by Maury Regional, discussed at p. 3, both studies were normal.

at a hospital) since the above date," *i.e.*, May 13, 2010, and "[h]ave you been hospitalized since the above date." The date attributed to this form in the Administrative Record is April 13, 2011.

Plaintiff was treated by Dr. Jonathan Pettit, M.D., on August 15 and September 6, 2011. (Doc. 10, pp. 233-35) Plaintiff presented for treatment on August 15th for a broken left ankle and right foot fracture that she suffered after falling down the stairs at home. (Doc. 10, pp. 233-34) X-rays made during plaintiff's September 6th followup with Dr. Pettit showed that the fracture of her left ankle had maintained proper alignment and that the fracture in her right foot was healing well. (Doc. 10, p. 235)

Plaintiff was seen by Dr. Brian O'Shaughnessy, M.D., on October 11, 2011 for a neurosurgical consultation. (Doc. 10, pp. 236-37) Referring to "an MRI of her cervical spine on a CD," Dr. O'Shaughnessy concluded that plaintiff had "significant stenosis at C4-5, C5-6, and C6-7 . . . [but no] evidence of a fracture or dislocation." (Doc. 10, p. 237) There is no indication in the medical records that plaintiff actually underwent spinal surgery.

The final medical evidence in the administrative is an undated letter from Sherry Fogg-Arnold, LMT, CMT, addressed "To whom it may concern." (Doc. 10, p. 238) A licensed, certified massage therapist, Ms. Fogg-Arnold's letter describes plaintiff's neck and back pain for which Ms. Fogg-Arnold had provided therapy.

### B. Transcript of the Hearing

The following exchange between the ALJ and plaintiff occurred prior to plaintiff's testimony at the hearing:

> ALJ: Good afternoon, Ms. Martin. I'm Judge Dougherty. I'll be hearing your case today. . . . Before we take your testimony we want to talk about a couple of things. The first thing we want to talk about is that you're currently not represented by counsel.

CLMT: No.

ALJ: All right, so we have a form that you filled out prior to the hearing and this indicates that you read this form that explains your rights to representation - -

CLMT: Yes.

ALJ: I'm holding [the form] in my hand and . . . you want to proceed without a representative.  Is that correct?

CLMT: Right.

ALJ: Okay, so we'll go ahead and make that an exhibit. . . .

(Doc. 10, p. 28)  After addressing plaintiff's waiver of representation, the ALJ then conducted an exhibit-by-exhibit inventory of the medical evidence before him.  (Doc. 10, pp. 29-30)

Following the preliminaries above, the ALJ inquired about plaintiff's back problems.  (Doc. 10, p. 31)  Permitting plaintiff to respond in narrative fashion, plaintiff testified at length about her back, things that cause her to experience back pain, medical diagnoses and treatment, limitations on both her ability to work and her daily life, etc.  (Doc. 10, pp. 31-33)  The ALJ then questioned plaintiff about her past attempts to work.  (Doc. 10, pp. 33-36)  Plaintiff again testified at length and in detail.

Plaintiff also testified about "Dr. Bromsethe [PHONETIC]" (hereinafter "Dr. Bromsethe") who treated her at an unspecified time prior to her last insured date. (Doc. 10, p. 37)  Plaintiff provided the following information about Dr. Bromsethe: he treated her at the Manchester hospital where she was hospitalized for a week; he "was an older man at that time"; she was unable to locate him on her own; she contacted the Manchester hospital in an effort to get in touch with him, but the hospital was unable to help her; she was unable to find him in the phone book.  (Doc. 10, p. 37)

Plaintiff then testified about her left hip.  (Doc. 10, p. 57)  The ALJ noted at this point that,

to be entitled to DIB, she had to have been disabled prior to turning 55 years of age, and that her date last insured was December 31, 2007. (Doc. 10, p. 37) More particularly, the ALJ told plaintiff that she needed to focus on "before the age of 55 . . . [that] after 55 [was] not relevant . . . [b]ecause [he]r . . . coverage ran out in 2007 . . . [and] . . . [she was] no longer covered for Title II disability benefits" after that date. (Doc. 10, p. 37)

Plaintiff replied as follows to the ALJ's explanation of the last insured date: "That's all foreign to me. I have no idea what you're saying." (Doc. 10, p. 37) Thereafter, the following exchange transpired between the ALJ and plaintiff:

> ALJ: What I'm saying to you is, Title II benefits, your application is only for Title II benefits and so Title II benefits are Social Security benefits that you pay into when, we used to call if FICA, that's money that came out of your check, part of the money was like an insurance policy. It went to Title II benefits coverage. But like all insurance policies the policy, you pay for it for only a certain period of time and for Title II your period of coverage ran out December 31, 2007 okay.
>
> CLMT: I understand.
>
> ALJ: So everything that happened after that is not relevant - -
>
> CLMT: A hill of beans.
>
> ALJ: - - because it's after the period of time when you were covered, okay, so we really need to be talking prior to 2007 which is the reference for you . . . .

(Doc. 10, pp. 37-38)

Plaintiff testified that "[t]he only thing before 2007 would probably . . . be . . . [her] hip." (Doc. 10, p. 39) The ALJ corrected plaintiff, reminded her that she had a diagnosis of lumbar disc disease and fatigue prior to 2007, and invited her to tell him about her fatigue and "diagnosis of borderline COPD." (Doc. 10, p. 39) Plaintiff noted that she had been on oxygen for about "a year

and a half, two years," and then testified at length about her fatigue. (Doc. 10, pp. 38-40)

Following plaintiff's testimony, the ALJ asked the VE to testify "on past relevant work over the past 15 years giving . . . skill levels and exertion levels." (Doc. 10, p. 40) The VE testified that the following jobs were vocationally relevant to plaintiff's past work: cashier, light semiskilled; assembly line worker, medium unskilled; sewing machine operator, light semiskilled; and order puller, medium semiskilled. (Doc. 10, p. 40) When the ALJ asked plaintiff if "that sound[ed] like a pretty accurate summary of your employment history," plaintiff replied, "since like 2000, yes." (Doc. 10, p. 41)

The ALJ then posed the three hypotheticals to the VE for an individual aged 51 to 55 years of age and a 10th grade education. The first hypothetical proposed by the ALJ was: "[A]n individual who can perform at a full range of medium. Based on, and no mental limitations, based on that residual functional capacity would that individual be able to perform any past relevant work?" (Doc. 10, p. 41) The VE replied that "[a]ll past work could . . . be performed." (Doc. 10, p. 41) The ALJ's second hypothetical was a person who "could perform at a full range of light with no mental limitations," to which the VE testified that the cashier and sewing machine operator jobs still would be available. (Doc. 10, p. 41) The ALJ's final hypothetical involved an individual who could "perform at a full range of sedentary" work, to which the VE testified that no past relevant work could be performed. (Doc. 10, p. 41) Noting that a sedentary RFC grid rule applied, the ALJ determined that there was "no reason to ask [the VE] about any other work in the regional or national economy." (Doc. 10, p. 42)

The ALJ asked plaintiff to think back to when she was between 51 and 55 years of age and whether she could have worked as a cashier. (Doc. 10, p. 42) Plaintiff testified that she had, in fact, worked as a cashier for "six, maybe eight months" in 2001, but that she "had to quit because [she]

couldn't stand up . . . that long . . . ." (Doc. 10, p. 42) Plaintiff also testified that she had worked as a sewing machine operator four times during the period, once for "about a year." (Doc. 10, pp. 42-43) Finally, plaintiff testified that she had worked as an assembly worker and order picker during that period, but she had to quit in 2001 when she hurt her back. (Doc. 10, p. 43)

The ALJ concluded the proceedings by asking plaintiff whether she could perform any of these jobs now or when she was 55 years of age. (Doc. 10, p. 43) Plaintiff testified that she could not, again replying at length and in detail to the question. (Doc. 10, pp. 43-44)

## C. The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if she can show her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process described below to determine whether an individual is "disabled" within the meaning of the Act.

> First, the claimant must demonstrate that she has not engaged in substantial gainful activity during the period of disability.
>
> Second, the claimant must show that she suffers from a severe medically determinable physical or mental impairment.
>
> Third, if the claimant shows that her impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1, then she is deemed disabled.
>
> Fourth, the ALJ determines whether, based on the claimant's RFC, the claimant can perform her past relevant work, in which case the claimant is not disabled.
>
> Fifth, the ALJ determines whether, based on the claimant's RFC, as well as her age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not

disabled.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 548 (6th Cir. 2004)(internal citations omitted); *Cruse v. Comm'r of Soc. Sec*., 502 F.3d 532, 539 (6th Cir. 2007). The claimant bears the burden of proof at steps one through four. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). The burden then shifts to the Commissioner at step five "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

The SSA's burden at the fifth step may be met by relying on the medical-vocational guidelines, known in the practice as "the grids," but only if the claimant is not significantly limited by nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics in the applicable grid rule. *See Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). In cases where the grids do not direct a conclusion as to the claimant's capacity, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through the testimony of a VE. *See Wright*, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253 at *4 (SSA)). In determining the claimant's RFC for purpose of the analysis at steps four and five, the SSA is required to consider the combined effect of all the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *see Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

A review of the record shows that the ALJ followed the required five-step process. Plaintiff does not allege that he did not.

### III. ANALYSIS

### A. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the findings of fact are supported by substantial evidence in the record, and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Key v. Callahan* 109 F.3d 270, 273 (6th Cir. 1997). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence also could support a different conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). In other words, if the ALJ's findings are supported by substantial evidence based on the record as a whole, then those findings are conclusive. 42 U.S.C. §§ 405(g), 1383(c); *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *see also Key*, 109 F.3d at 273.

### B. Claims of Error

### 1. Whether the ALJ Failed to Develop the Record Fully
### (Doc. 12-1, ¶ VI.A, pp. 8-11)

Plaintiff's first claim of error is that, because she was unrepresented at the hearing, the ALJ had a special duty to develop the record fully to ensure that she receive a full and fair hearing. Plaintiff argues that the ALJ failed in that duty.

The law is well established that ALJ has a duty to investigate the facts and develop the arguments both for and against granting benefits. *Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 397 (6th Cir. 2010)(citing *Sims v. Apfel*, 530 U.S. 103, 111 (2000)(citing *Richardson*, 402 U.S.

at 400-01)).  The ALJ has a special duty to develop the record when the claimant is proceeding

without representation, is incapable of presenting an effective case, and is unfamiliar with hearing

procedures.  *Wright-Hines*, 597 F.3d at 397 (citing *Lashley v. Sec'y of Health & Human Servs.*, 708

F.2d 1048, 1051-52 (6th Cir. 1983)).  Whether an ALJ has failed in this special duty is determined

on a case-by-case basis.  *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 857 (6th Cir.

1986); *Lashley*, 708 F.2d at 1051-52.   Plaintiff's specific arguments regarding her first claim of

error are addressed in ¶¶ a-i below.

>    **a.      The ALJ failed in his special duty to develop the record because plaintiff
>             was not represented at the hearing.**

It is unclear whether plaintiff intended to allege error simply because the ALJ permitted her

to proceed at the hearing without representation.  The Magistrate Judge will address this possible

claim for the sake of completeness.

The claimant has the right to be represented at the administrative hearing, and the

Commissioner is required to notify the claimant of that right.  42 U.S.C. § 1383(d)(2)(D); *see also*

20 C.F.R. §§ 404.1705, 404.1706.  However, the mere fact that the claimant proceeds without

representation at the hearing does not constitute error.  *Duncan*, 801 F.2d at 856 (citing *Lashley*, 708

F.2d at 1051).  The claimant may waive that right.  *Lashley*, 708 F.2d at 1052.  If the claimant elects

to do so, then the ALJ must ensure at the hearing that the claimant is aware of her right to be

represented, and establish that her waiver of that right was made intelligently.  *See Covucci v. Apfel*,

31 Fed.Appx. 909, 912 (6th Cir. 2002); *see also Allison v. Apfel*, 229 F.3d 1150, 2000 WL 1276950

at *5 (6th Cir. 2000).

The SSA advised plaintiff in writing at least twice prior to the hearing of her right to be

represented.  (Doc. 10, pp. 56-61, 64, 69-70)  Plaintiff acknowledged that right by completing,

signing, and returning Form OMB NO. 0960-0671 that the SSA sent to her in its August 26, 2011

hearing notice, which included a detailed explanation of her right to representation. (Doc. 10, pp. 71, 74) Plaintiff's signed response to the SSA's hearing notice, the exchange between the ALJ and plaintiff at the hearing concerning her right to be represented, discussed at pp. 5-6, the waiver form that plaintiff executed at the hearing, discussed at p. 6, and plaintiff's obvious understanding of the proceedings as discussed in ¶ b below, constitute substantial evidence that plaintiff was aware of her right to be represented at the hearing, and that she waived that right knowingly and intelligently.

For the reasons explained above, any claim that the ALJ erred merely by permitting plaintiff to proceed at the hearing without representation is without merit.

**b.    The ALJ had a special duty to develop the record because plaintiff only had a tenth-grade education.**

It also is unclear whether plaintiff intended to allege that the ALJ erred in permitting her to proceed at the hearing without representation because she only had a tenth-grade education. Again, the Magistrate Judge will address this possible claim for the sake of completeness.

The record shows that plaintiff did, in fact, have only a tenth grade education. (Doc. 10, p. 94) As discussed at p. 8, the ALJ's questions to the VE shows that the ALJ was aware of that fact. The only question here is whether plaintiff's limited education impeded her ability to represent herself at the hearing. *See e.g., Allison*, 229 F.3d at *5.

Plaintiff's understanding of the role of procedures at the hearing is demonstrated by her statement when, oddly enough, she asked the ALJ if he knew what a "pole saw" was. (Doc. 10, p. 32) Although the ALJ replied, "No, why don't you tell me," plaintiff immediately interjected, "I'm sorry, I'm not supposed to ask you questions." (Doc. 10, p. 32) Plaintiff's statement that she was "not supposed to ask [the ALJ] questions," whether right or wrong, demonstrates her awareness that the conduct of the hearing was governed by procedures. Additionally, that plaintiff was actively engaged in the proceeding, and not intimidated by it or merely sitting on the sidelines as an observer,

is reflected in the exchange between the ALJ and plaintiff discussed at pp. 7-8. When the ALJ tried to explain the effect of the last insured date, plaintiff was not reluctant to tell the ALJ, "That's all foreign to me. I have no idea what you're saying." (Doc. 10, p. 37) When the ALJ rephrased his explanation, plaintiff replied, "I understand." (Doc. 10, p. 37) That plaintiff actually understood the ALJ's explanation is reflected in her remark that anything after date last insured did not amount to "[a] hill of beans." (Doc. 10, p. 37) Finally, a plain reading of the transcript of the hearing shows that plaintiff acquitted her self well in those proceedings. She testified with clarity and in detail, and was fully responsive to the ALJ's questions.

That plaintiff had only a tenth-grade education did not impede her ability to represent herself at the hearing. Therefore, this argument is without merit.

    c.    **The ALJ failed to obtain medical records from Dr. Bart,[8] Dr. Powers, and Dr. Bromsethe.**

The clinical records of Drs. Bart and Powers were among those addressed exhibit-by-exhibit by the ALJ prior to taking plaintiff's testimony. (Doc. 10, pp. 29-31) As previously noted at p. 6, plaintiff raised Dr. Bromsethe during her testimony. (Doc. 10, p. 37)

Plaintiff testified at the hearing that Dr. Bart and Powers were in the same office, and that it "just depend[ed] on who [wa]s there to sign" as to which of them signed the records. (Doc. 10, p. 29) As previously established at pp. 3-4, Dr. Bart's clinical records are in the administrative record. Given that plaintiff already had obtained the records from Dr. Bart, and given that those records were before the ALJ at the time of the hearing, the ALJ did not have a duty to go back to Dr. Bart to see if there were more.

As to Dr. Powers, plaintiff testified at the hearing that she saw him in 2011 – long after the

---

[8] Dr. Bart's name is spelled "Bard [PHONETIC]" in the transcript. (Doc. 10, p. 29)

last insured date – because her face was "swelling." (Doc. 10, p. 29) The medical record of that 2011 office visit was not relevant to plaintiff's DIB claim for two reasons: first, the treatment occurred after the last insured date; second, the "swelling" of her face had nothing to do with any of plaintiffs conditions that allegedly limited her ability to work. Here too, inasmuch as plaintiff already had obtained the records from Dr. Powers, and given that those records were before the ALJ at the time of the hearing, the ALJ once again did not have a duty to go back to Dr. Powers to see if there were any additional records.

The issue of Dr. Bromsethe raises the question of how much an ALJ is obligated to develop the record where the claimant is not represented. As previously noted at p. 6, Dr. Bromsethe treated plaintiff at least four years prior to the hearing, he was an older man at the time, plaintiff was unable to locate him, his telephone number was not in the phone book, and the Manchester hospital had been unable to help her find him. The ALJ is not required to launch an independent investigation into the dark unknown for the purpose of developing the record. *See e.g., Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009)(standing for the proposition that the ALJ is not required to conduct independent investigations to comply with the regulations).

This argument is without merit.

> **d.** **The ALJ failed to obtain medical source statements from plaintiff's treating physicians.**

Plaintiff does not identify the treating physician(s) to whom she is referring nor, given that plaintiff now is represented by counsel, is the court required to sort that out for her. That said, the Magistrate Judge assumes for the sake of argument that some of the medical records are attributable to one or more "treating physicians" within the meaning of that expression.

Although there is a paucity of case law on this point in the Sixth Circuit, the Sixth Circuit determined in an unpublished 2002 case that the ALJ did not err by not obtaining an MRI – read

medical source statement(s) in the instant case – for a plaintiff who proceeded without representation at the administrative hearing. *Nabours v. Comm'r of Soc. Sec.*, 50 Fed.Appx. 272, 275 (6th Cir. 2002). Key considerations in that decision included that the claimant had "no discernable problems" in representing herself at the hearing, that no one "took advantage" of her when she proceeded without representation, that she was "sufficiently articulate" in her direct testimony, that she obtained "an impressive amount" of medical evidence to support her case, and that she was "attuned enough" to actively participate in the proceedings. Under those circumstances, present in the instant case, the Sixth Circuit determined that the ALJ did not err in not obtaining the MRI at issue in that case. Because the circumstances that led to the Sixth Circuit's decision in *Nabours* are present here, the ALJ did not err in not obtaining the medical source statement(s) at issue.

Assuming for the sake of argument that it were determined upon subsequent review that the ALJ ought to have obtained the medical source statement(s) at issue here, any such error on the ALJ's part would be harmless because there is no objective medical evidence on the record that would support an opinion favorable to plaintiff *vis-a-vis* her DIB claim. As previously noted at pp. 2-3, the objective medical evidence from Maury Regional from May 2002 through the last insured date was normal/unremarkable in each and every instance. As previously noted at pp. 3-4, there is no objective medical evidence in Dr. Bart's medical record for the period June 9, 2006 through the date last insured. Thus, even if the ALJ had obtained a medical source statement from Dr. Bart, there is no objective medical evidence to support that statement were it favorable to plaintiff's DIB claim. Finally, neither Dr. Pettit nor Dr. O'Shaughnessy, discussed at p. 5, are "treating physicians" within the meaning of that expression. In any event, the treatment they provided was several years after the last insured date and, therefore, not relevant to plaintiff's DIB claim.

This argument is without merit.

**e.**        **The ALJ failed to question plaintiff adequately regarding her impairments and resulting limitations.**

**f.**        **The ALJ erred in not inquiring sufficiently into plaintiff's specific symptoms or limitations related to her impairments.**

**g.**        **The ALJ failed to allow plaintiff an opportunity to provide additional testimony regarding her impairments, symptoms, limitations or any other information she felt would be relevant or important to her claim.**

Plaintiff argues generally in ¶¶ e-f above that the ALJ failed to question her sufficiently regarding her impairments. Although plaintiff repeats her argument three times that the ALJ failed to inquire into her symptoms, limitations, impairments, duration and frequency of pain, plaintiff fails to provide any specifics regarding the ALJ's alleged error and/or how the outcome would have been different had the ALJ inquired more in accordance with plaintiff's after-the-fact expectations on appeal. In short, plaintiff's arguments are conclusory.

In addition to plaintiff's arguments in ¶¶ e-f above being conclusory, the transcript of the hearing simply does not support plaintiff's argument. The transcript shows that the ALJ asked specific questions regarding plaintiff's specific impairments to which plaintiff responded in comprehensive narrative form that addressed each of these areas of inquiry, *i.e.*, her symptoms, limitations, duration and frequency of pain. Indeed, looking at the transcript of the hearing, the Magistrate Judge fails to see where the ALJ should have sought clarification based on plaintiff's answers.

In addition to the foregoing, the transcript of the hearing provides at least one example of the ALJ helping plaintiff expand her testimony for the purpose of developing the record. When the ALJ sought to focus plaintiff's attention on the period of time up to and including the date last insured, as discussed at p. 7, plaintiff answered, "[t]he only thing before 2007 would probably just be maybe my hip." The ALJ reminded her of early complaints of/treatment for back pain, invited

testimony concerning that limitation, and plaintiff complied.

With respect to ¶ g above, the transcript of the hearing supports plaintiff's argument that the ALJ did not give her an opportunity to provide additional testimony. However, plaintiff once again does not provide any examples of where she would have offered additional testimony had she had the chance, how that additional testimony would have clarified the testimony that she gave, or what difference that additional testimony would have made in the proceedings below. In short, plaintiff's argument in ¶ g above is, once again, conclusory.

The arguments in ¶¶ e-g above are without merit.

**h.     The ALJ failed to ask the VE hypotheticals based on the limitations about which plaintiff had testified.**

The law is "well established that an ALJ may pose hypothetical questions to a vocational expert and [but] is required to incorporate only those limitations accepted as credible by the finder of fact." *Winslow v. Comm'r of Soc. Sec.*, __ Fed.Appx.__ at *2 (6ᵗʰ Cir. 2014)(citing *Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1235 (6ᵗʰ Cir. 1993). The ALJ is not required to accept claimant's subjective complaints as the basis for presenting a hypothetical to the VE. *Jones*, 336 F.3d at 476.

As previously established, there is no objective medical evidence whatsoever in the record that supports plaintiff's claim for DIB. On the other hand, there is ample objective medical evidence on the record that refutes plaintiff's claim for DIB, certainly through the last insured date. Therefore, the ALJ did not err in not including plaintiff's subjective complaints in his hypotheticals.

This argument is without merit.

**i.     The ALJ failed to address in his opinion plaintiff's testimony regarding why her impairments prevented her from performing past work.**

The ALJ determined that plaintiff's "testimony of disabling pain [wa]s inconsistent with

objective and clinical findings" and, as such, he determined that her "testimony of disabling pain, not fully credible." (Doc. 10, p. 20) Substantial evidence supports the ALJ's determination that plaintiff's "testimony of disabling pain [was] not fully credible." As noted throughout, the record is devoid of any objective medical evidence to support her DIB claim. Having determined that her testimony was not fully credible, the ALJ was not required to address her subjective complaints in greater depth in his decision.

This argument is without merit.

### 2. Whether the ALJ Erred in Finding that Plaintiff Could Perform the Full Range of Medium Work (Doc. 12-1, ¶ VI.B, pp. 12-13)

Plaintiff argues that the ALJ failed to perform a function-by function assessment of plaintiff's RFC as required by SSR 96-8p. More particularly, plaintiff asserts that the ALJ failed to take her postural and environmental limitations into account in his RFC assessment.

SSR 96–8p requires an ALJ to assess individually the exertional (lifting, carrying, standing, walking, sitting, pushing, and pulling), and non-exertional (manipulative, postural, visual, communicative, and mental functions) capacities of the claimant in determining a claimant's RFC. In making this determination, the ALJ must consider all relevant evidence in the record. 20 C.F.R. §§ 404.1545, 416.945; SSR 96–8p, 1996 WL 374184, at *5 (SSA). Although SSR 96–8p requires a "function-by-function evaluation" to determine a claimant's RFC, case law does not require the ALJ to discuss those capacities for which no limitation is alleged. *See Winslow v. Comm's of Soc. Sec.*, __ Fed.Appx. __ at * 2, (6th Cir 2014)( citing *Rudd v. Comm'r of Soc. Sec.*, 531 Fed.Appx. 719, 729 (6th Cir. 2013)(citing *Delgado v. Comm'r of Soc. Sec.*, 30 Fed.Appx. 542, 547-48 (6th Cir. 2002)(*per curiam*)(collecting cases)).

The record shows that the ALJ conducted a lengthy RFC analysis in which he correctly noted

the regulations by which his RFC analysis was governed, that he followed those regulations in making his RFC assessment, and that he addressed plaintiff's alleged back pain, hip pain, and hypertension in the process. (Doc. 10, pp. 19-21) The ALJ noted correctly that the record was devoid of any objective medical evidence to support plaintiff's DIB claim based on these alleged limitations. As to plaintiff's "borderline COPD" diagnosed in 2006, COPD was not one of the limitations alleged. Therefore, the ALJ was not required to address it in his decision. Although plaintiff attempted to link COPD at the hearing with the fact that she was using oxygen at night at the time of the hearing, as discussed at p. 8, plaintiff testified that she had been on oxygen only "a year and a half, two years" at the time of the hearing, and that she had not been oxygen prior to the last insured date. Given that this case pertains solely to plaintiff's DIB claim, with a last insured date of December 31, 2007, the fact that plaintiff may have been on oxygen in November 2011 was not relevant to the ALJ's RFC assessment.

Finally, the record shows that the ALJ's RFC assessment was supported by substantial evidence. As previously discussed, Dr. Mather determined that plaintiff had the physical RFC to perform the full range of medium work. Inasmuch as no postural or environmental limitations were supported by the records that Dr. Mather evaluated, no postural or environmental limitations were assigned. Dr. Mather's assessment was affirmed on review by Dr. Fields. In the absence of any objective medical evidence to the contrary in support of plaintiff's alleged limitations, the ALJ correctly gave "significant weight" to the opinions of Drs. Mather and Fields.

As shown above, the ALJ complied with the applicable regulations in his RFC assessment, and his RFC assessment is supported by substantial evidence. Therefore, plaintiff's second claim of error is without merit.

### 3. Whether the ALJ Failed to Evaluate and Assess Plaintiff's Statements in Accordance With

Plaintiff argues that the ALJ did not evaluate her credibility in accordance with SSR 96-7p. More particularly, plaintiff argues that the ALJ failed to "specify the weight accorded to Plaintiff's allegations and testimony, merely starting she was not fully credible,'" that the ALJ "detracte[ed] from Plaintiff's credibility based on the fact" that she was unable to locate and obtain treatment records from "one of her treating physicians," that the ALJ overlooked "objective evidence of an underlying lumbar spine impairment which could reasonably be expected to cause Plaintiff's alleged symptoms and limitations," that the ALJ failed to consider "all of the factors for evaluating a claimant's credibility despite noting these factors in his decision," and that the ALJ "completely ignored Plaintiff's therapy records."

The ALJ is required to "explain his credibility determinations in his decision such that it 'must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Rogers*, 486 F.3d at 248 (quoting Social Security Ruling 96–7p, 1996 WL 374186, at *2 (SSA)). 20 C.F.R. § 404.1529 and SSR 96–7p describe a two-part process for assessing the credibility of an individual's statements about symptoms, including pain. First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; second, the ALJ must evaluate the intensity, persistence, and functional limitations of those symptoms by considering objective medical evidence and other evidence, including: 1) daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; 5) treatment, other than medication, received for relief of pain or other symptoms; 6) any measures used to relieve pain or

other symptoms; and 7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c); SSR. 96–7p, 1996 WL 374186 at * 3 (SSA).

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 654 (6th Cir. 2009)(quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). An ALJ's credibility assessment will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). The Sixth Circuit has "held that an administrative law judge's credibility findings are virtually 'unchallengeable.'" *Ritchie v. Comm'r of Soc. Sec.*, 540 Fed.Appx. 508, 511 (6th Cir. 2013)(quoting *Payne v. Comm'r of Soc. Sec.*, 402 Fed.Appx. 109, 112-13 (6th Cir. 2010)). That said, however, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm's of Soc. Sec.*, 437 Fed.Appx. 370, 371 (6th Cir. 2011)(quoting *Walters*, 127 F.3d at 531).

The question before the court is whether the ALJ's "virtually 'unchallengeable'" credibility determination in this case is somehow not worthy of "great weight and deference" and, as such, is challengeable. The first question in that query is whether the ALJ followed the regulations in his credibility determination. The short answer to that question is, "He did."

Plaintiff's first argument is that the ALJ did not "specify the weight accorded to the Plaintiff's allegations and testimony, merely stating she was 'not fully credible.'" While it is true that the ALJ did not use percentages or adjectives to describe the weight that he gave to plaintiff's subjective complaints, the ALJ's limitation-by-limitation analysis leading up to his credibility determination is sufficiently detailed that subsequent reviewers would understand that the ALJ gave significantly greater weight to the objective medical evidence, or lack thereof, than he gave to plaintiff's subjective complaints, and the reasons why.

Plaintiff argues next that the ALJ erred in "detracting from Plaintiff's credibility" because of her inability "to locate one of her treating physicians in order to obtain the treatment records." The plaintiff does not identify the "treating physician," nor is his/her identity important. The ALJ does not mention missing records in his decision in the context of his credibility determination or in any other context. Plaintiff's suggestion that the ALJ somehow held missing medical records against her, tacitly or otherwise, is not supported by the record.

Plaintiff argues next that the ALJ did not discuss each and every factor enumerated in SSR-96-7p. The record shows that the ALJ identified each of those factors in his decision, and acknowledged that he was required to consider the evidence in the context of those factors. Although the ALJ did not address plaintiff's subjective complaints on a factor-by-factor basis, plaintiff has not provided law and argument to support the position that the ALJ was required to do so, nor is the Magistrate Judge aware that any such requirement. Where, as here, there is a dearth of objective medical evidence to support plaintiff's subjective complaints, that utter absence of objective medical evidence would apply across the board to all of the factors.

Finally, plaintiff argues that the ALJ completely ignored plaintiff's therapy records. Plaintiff is incorrect. The ALJ mentioned plaintiff's therapy twice, *i.e.,* that she had "received some treatment, of a conservative nature, for back pain during the relevant period," and that the medical records from Maury Regional that she had "received physical therapy in December 2007 . . . ." (Doc. 10, p. 20) It is apparent from this that the ALJ did not overlook plaintiff's physical therapy for her back. However, plaintiff's physical therapy was but one part of the medical record of evidence. Even if physical therapy records were accorded equal weight to the other medical evidence of record, the ALJ would still have to be affirmed because his credibility determination is supported by substantial evidence.

For the reasons explained above, the ALJ did not err in his credibility determination. Therefore, plaintiff's third claim of error is without merit.

## IV. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the record (Doc. 12) be **DENIED** and the Commissioner's decision **AFFIRMED**.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 27th day of May, 2014.


/s/ Joe B. Brown
Joe B. Brown
United States Magistrate Judge